UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| JANEEN KALLAS,<br><br>       Plaintiff,<br><br> v.<br><br>MICHAEL J. ASTRUE, Commissioner of Social Security,<br><br>       Defendant. | Case No. 3:09-cv-05780-KLS<br><br>ORDER AFFIRMING DEFENDANT'S DECISION TO DENY BENEFITS |

Plaintiff has brought this matter for judicial review of defendant's denial of her application for supplemental security income ("SSI") benefits. This matter has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C.§636(b)(1)(B) and Local Rule MJR 4(a)(4) and as authorized by <u>Mathews, Secretary of H.E.W. v. Weber</u>, 423 U.S. 261 (1976). After reviewing the parties' briefs and the remaining record, the Court hereby finds that for the reasons set forth below, defendant's decision to deny benefits is affirmed.

<u>FACTUAL AND PROCEDURAL HISTORY</u>

On November 9, 2004, plaintiff filed an application for SSI benefits, alleging disability as of December 1, 2002, due to an attention deficit hyperactivity disorder ("ADHD"), a bi-polar disorder, a post-traumatic stress disorder ("PTSD"), and a borderline personality disorder. <u>See</u> Tr. 15, 116. Her application was denied upon initial review and on reconsideration. <u>See</u> Tr. 15, 43, 47. A hearing was held before an administrative law judge ("ALJ") on July 9, 2007, at which plaintiff, represented by counsel, appeared and testified, as did a vocational expert. <u>See</u> Tr. 512-

ORDER - 1

39.

On September 26, 2007, the ALJ issued a decision in which plaintiff was determined to be not disabled. See Tr. 15-23.  Plaintiff's request for review of the ALJ's decision was denied by the Appeals Council on November 25, 2009, making the ALJ's decision defendant's final decision. See Tr. 4; see also 20 C.F.R.§416.1481.  On December 21, 2009, plaintiff filed a complaint in this Court seeking judicial review of defendant's decision. See (ECF #1-#3).  The administrative record was filed with the Court on March 10, 2010. See (ECF #12).  The parties have completed their briefing, and thus this matter is now ripe for judicial review and a decision by the Court.

Plaintiff argues defendant's decision should be reversed and remanded for an award of benefits or, in the alternative, for further administrative proceedings, because the ALJ erred: (1) in evaluating the medical in the record; (2) in failing to fully and fairly develop the record; (3) in assessing plaintiff's credibility; and (4) in not including all of her functional limitations in the hypothetical question posed to the vocational expert.  For the reasons set forth below, the Court does not agree that the ALJ erred in determining plaintiff to be not disabled, and therefore hereby finds that the ALJ's decision should be affirmed.

## DISCUSSION

This Court must uphold defendant's determination that plaintiff is not disabled if the proper legal standards were applied and there is substantial evidence in the record as a whole to support the determination. See Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. See Richardson v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985).  It is more than a scintilla but less than a preponderance. See

ORDER - 2

Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991). If the evidence admits of more than one rational interpretation, the Court must uphold defendant's decision. See Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).

I. The ALJ Did Not Err in Evaluating the Medical Evidence in the Record

The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the medical evidence. See Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998). Where the medical evidence in the record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982). In such cases, "the ALJ's conclusion must be upheld." Morgan v. Commissioner of the Social Sec. Admin., 169 F.3d 595, 601 (9th Cir. 1999). Determining whether inconsistencies in the medical evidence "are material (or are in fact inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts "falls within this responsibility." Id. at 603.

In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be supported by specific, cogent reasons." Reddick, 157 F.3d at 725. The ALJ can do this "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Id. The ALJ also may draw inferences "logically flowing from the evidence." Sample, 694 F.2d at 642. Further, the Court itself may draw "specific and legitimate inferences from the ALJ's opinion." Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989).

The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of either a treating or examining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir.

ORDER - 3

1996). Even when a treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." Id. at 830-31. However, the ALJ "need not discuss *all* evidence presented" to him or her. Vincent on Behalf of Vincent v. Heckler, 739 F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in original). The ALJ must only explain why "significant probative evidence has been rejected." Id.; see also Cotter v. Harris, 642 F.2d 700, 706-07 (3rd Cir. 1981); Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984).

In general, more weight is given to a treating physician's opinion than to the opinions of those who do not treat the claimant. See Lester, 81 F.3d at 830. On the other hand, an ALJ need not accept the opinion of a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings" or "by the record as a whole." Batson v. Commissioner of Social Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004); see also Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001). An examining physician's opinion is "entitled to greater weight than the opinion of a nonexamining physician." Lester, 81 F.3d at 830-31. A non-examining physician's opinion may constitute substantial evidence if "it is consistent with other independent evidence in the record." Id. at 830-31; Tonapetyan, 242 F.3d at 1149.

A.   Dr. Riabova

In early February 2003, plaintiff was evaluated by K. Riabova, M.D., who diagnosed her with a bipolar disorder currently with a mixed mood, PTSD, a borderline personality disorder, and a global assessment of functioning ("GAF") score of 50.[1] See Tr. 143. In his decision, the

---

[1] A GAF score is "a subjective determination based on a scale of 100 to 1 of 'the [mental health] clinician's judgment of [a claimant's] overall level of functioning.'" Pisciotta v. Astrue, 500 F.3d 1074, 1076 n.1 (10th Cir. 2007). It is "relevant evidence" of the claimant's ability to function mentally. England v. Astrue, 490 F.3d 1017, 1023, n.8 (8th Cir. 2007). "A GAF score of 41-50 indicates '[s]erious symptoms . . . [or] serious impairment in

ORDER - 4

ALJ noted Dr. Riabova prescribed for plaintiff at the time "depakote and seroquel . . . pending treatment" of the above disorders, along with a "history of past suicide attempt." Tr. 17.  Plaintiff argues that the ALJ erred here in failing to properly consider, and in essentially giving no weight to, Dr. Riabova's evaluation report.

Plaintiff, however, has not explained, let alone shown, how the ALJ erred here or that any error on the ALJ's part was other than harmless in this case.  While, as noted above, an ALJ must explain why significant probative evidence has been rejected, and although the ALJ in this case did not actually state what weight he gave to Dr. Riabova's report, plaintiff fails to specifically assert the ALJ erred in not making such a finding here.  In addition, had plaintiff asserted such error, no showing has been made that any functional limitations found by Dr. Riabova – the only indication of which is the assessed GAF score of 50 – is not adequately covered by the ALJ's assessment of plaintiff's mental residual functional capacity.[2]  See Stout v. Commissioner, Social Sec. Admin., 454 F.3d 1050, 1055 (9th Cir. 2006) (error harmless where it is non-prejudicial to claimant or irrelevant to ALJ's ultimate disability conclusion).

B.      Dr. Price and Ms. Nelson

Plaintiff argues the ALJ failed to give proper weight to the late September 2004 opinion of Marne Nelson, A.R.N.P., in which, based on a psychiatric evaluation conducted at the time, plaintiff was diagnosed with a recurrent major depressive disorder, PTSD, methamphetamine

---

social, occupational, or school functioning,' such as an inability to keep a job." Pisciotta, 500 F.3d at 1076 n.1 (quoting Diagnostic and Statistical Manual of Mental Disorders (Text Revision 4th ed. 2000) at 34); see also England, 490 F.3d at 1023, n.8 (8th Cir. 2007) (GAF score of 50 reflects serious limitations in general ability to perform basic tasks of daily life).

[2] Specifically, the ALJ found plaintiff "would be restricted to simple or 'unskilled' work requiring limited direct interaction with co-workers and the general public." Tr. 19.  Further, while a GAF score is relevant evidence, and thus may be "of considerable help" to the ALJ in assessing a claimant's residual functional capacity, "it is not essential" to the accuracy of that assessment. Howard v. Commissioner of Social Security, 276 F.3d 235, 241 (6th Cir. 2002).  Therefore, an ALJ's "failure to reference the GAF score" in assessing a claimant's residual functional capacity "standing alone" does not make the residual functional capacity assessment inaccurate. Id.  In any event, no showing has been made that a GAF score of 50 is inconsistent with the restrictions found by the ALJ.

ORDER - 5

dependence in early full remission, rule out ADHD of the combined type, and a GAF score of 45 to 50. See Tr. 402.  Plaintiff also argues the ALJ did not properly consider the opinion of Richard Price, M.D., also based on a psychiatric evaluation conducted in early February 2005, in which she was found to have the following diagnoses: rule out PTSD, methamphetamine dependence in remission, a math disorder, ADHD, a borderline personality disorder, and a GAF score of 40-45. See Tr. 180.  Dr. Price further concluded in relevant part:

> . . . The claimant has had a very unstable life and as a consequence, has many mental and emotional problems.  She is, however, in an excellent treatment program involving group therapy for her borderline personality disorder, medication management, and group therapy and individual therapy for her methamphetamine dependence.
>
> With her combination of conditions, recovery to the point of  full employability is in a matter of years rather than months.  She seems very invested in therapy and recognizes her need to stay in therapy.
>
> . . . The claimant seems to be capable of managing her funds.  She did well actually in the arithmetic portion of the Mini Mental Status Examination but she did spontaneously describe symptoms consistent with dyslexia in her history.  The claimant has the ability to perform simple and repetitive tasks.  It is uncertain whether she would be able to perform detailed and complex tasks.  She seems to be an intelligent young lady, however, she has serious problems with concentration and focusing.  The claimant's work history suggests that she has been able to accept instructions from supervisors.  She probably does best in jobs where it is not necessary for her to interact with coworkers and the public.  AT [sic] this time, she probably would be unable to maintain regular attendance in a workplace or perform consistently.

Id.

The ALJ addressed the opinions of these two medical sources as follows:

> I has [sic] . . . considered the possible contributing materiality of the claimant's ongoing alcohol abuse through at least her March 2004 DUI, and substance abuse/meth-amphetamine dependence ongoing until early March 2005 (Ex. 10-F, p. 62), observing that by far, the most restrictive assessments, such as the consultative psychiatric evaluation by N.P. Nelson on September 24, 2004 and then by consultative psychiatrist Richard Price, M.D.[,] on February 1, 2005, would both have been during this period when the record confirms that the claimant chronically abused substances.  Therefore, I must

ORDER - 6

>accord less weight to these medical opinions from Nurse Practitioner Nelson and Dr. Price because they make reference to "early full remission" (Ex. 13-F, p. 40) and "methamphetamine abuse in remission" (Ex. 6-F, p. 4) which the record suggests were neither accurate, nor fully durational.  For this significant reason, I suspect that any argument for "disability" prior to the claimant's remission from chronic methamphetamine dependence disorder *was* a contributing factor material to the finding of "disability."[3]  Further, I find that because of the very mild symptomatology at best as repeatedly detailed in the generally upbeat mental health treatment notes from May 2005 to February 2006, during which time the claimant received mental health treatment and maintained sobriety, the severity of the medical opinions of Nurse Practitioner Nelson and Dr. Price would not be durational, as directed by the [Social Security] Act.  Therefore, for this reason as well, I accord less weight to these medical opinions.

Tr. 19-20 (emphasis in original).  Plaintiff argues the record shows she had been clean and sober for approximately six months prior to Ms. Nelson's evaluation report and for nearly a year prior to the evaluation report issued by Dr. Price, and therefore both medical sources' opinions should be considered independent of her history of substance abuse.  The Court disagrees.

First, the ALJ's summary of plaintiff's substance abuse history for the above time period is fairly supported by the evidence in the record.  In early April 2004, plaintiff denied engaging in "any illicit drug use," reporting further that she had "been in remission from drug use now for eight years." Tr. 475.  In early May 2004, while plaintiff "initially" stated having been "clean for some time," her treatment provider went on to report in relevant part as follows:

>Review of the labs show that she did have a positive urine toxicology for amphetamine use.
>
>We talked a little bit about the urine toxicology screen and then she admits that she did take a line of methamphetamine. . . . She does not use very often and states that she does not believe that this is going to be a problem.  She is planning that she will followup [sic] on her own with regards to any substance abuse rule out.  She does not feel like she is really at risk for this.

---

[3] A claimant may not be found disabled if alcoholism or drug addiction would be "a contributing factor material to the Commissioner's determination" that the claimant is disabled. <u>Bustamante v. Massanari</u>, 262 F.3d 949, 954 (9th Cir. 2001) (citing 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J)).

ORDER - 7

Tr. 474.  In late June 2004, plaintiff reported having been arrested for a DUI, having been "found positive [at the time of the] charge for methamphetamines," and having used methamphetamines "36 hours before she was arrested for the DUI." Tr. 418.  A "Chemical Dependency Assessment Summary" completed in early October 2004 – which, it should be noted, is just after Ms. Perkins completed her own evaluation report – found that based on plaintiff's "self-report and available collateral information," there was "sufficient evidence of substance abuse," and that she seemed "to have a significant problem with methamphetamine & alcohol at this time." Tr. 504; but see Tr. 505 (noting plaintiff's actual self-report at that time for both methamphetamine and alcohol last use was March 2004, and April 2004, respectively).

In mid-March 2005, while plaintiff reported that she was "still clean," she also admitted that "she did use the day before she found out that she was pregnant," which, as discussed below, appears to have been sometime around late October or early November 2004. Tr. 378.  One of her mental health counselors also noted around that time, that plaintiff began the appointment by stating she had used methamphetamines "with another client while pregnant," though she did not specify exactly when or for how long. Tr. 371.  On May 31, 2005, plaintiff reported being "clean and sober for 82 days," which would place the date of her last use as being March 10, 2005. Tr. 262.  In early June 2005, it was reported that plaintiff "apparently was on methamphetamine very early in her pregnancy," and that while plaintiff was "not sure of the last date," she did state she had "been 'clean' for several months now." Tr. 307.  At the time, plaintiff was noted to be more than 21 weeks pregnant, which – again if true and contrary to her last most recent report – would indicate she last used sometime in late October or early November 2004. See id.

In late September 2006, plaintiff was noted to have "remained clean and sober for almost 19 months," and in mid-December 2006, she was reported to have been "in recovery now for 22

ORDER - 8

months," which means that, once more if these reports are true, such recovery did not begin until sometime in February 2005, placing the start of that period several months after the date of Ms. Perkins's evaluation report, and at approximately the same time as the date Dr. Price issued his own report. Tr. 449, 508.  As such, there was sufficient evidence for the ALJ to find that plaintiff continued to engage in chronic – or at the very least on-going – methamphetamine use up until at least early March 2005.  Accordingly, the ALJ did not err in so finding.

The ALJ, furthermore, provided an additional valid rationale for rejecting the evaluation reports of both Ms. Nelson and Dr. Price.  That is, the substantial medical evidence in the record supports the ALJ's decision to accord less weight to those reports on the basis that mental health treatment records showed generally mild symptoms and significant improvement in her overall condition for the period from May 2005, to February 2006, thus failing in regard to either report to satisfy the durational requirement for establishing disability under the Social Security Act. See Tr. 203-07, 209-12, 214, 217-21, 224-26, 228-30, 232-36, 238-41, 243-44, 246, 251-59, 262, 265-66, 275, 280, 354-57, 359, 450, 452, 508-09; see also Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (claimant must show  he or she suffers from medically determinable impairment that can be expected to result in death or that has lasted or can be expected to last for continuous period of not less than twelve months).  Indeed, even Ms. Nelson noted substantial improvement during the early part of 2005.[4]  See Tr. 376-78, 392.

C. Dr. Neims

Plaintiff next argues the ALJ erred in rejecting the medical opinion of Daniel M. Neims,

---

[4] Plaintiff implies the ALJ erred in relying on those of Ms. Nelson's treatment notes that show improvement in her mental functioning, while at the same time rejecting the earlier evaluation report findings.  But this is precisely the point, as discrepancies between a opinion source's functional assessment and that source's clinical notes, recorded observations or other comments regarding a claimant's capabilities, including those made after the assessment has been made, "is a clear and convincing reason for not relying" on the assessment. Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005); see also Weetman v. Sullivan, 877 F.2d 20, 23 (9th Cir. 1989).

ORDER - 9

Psy.D., an examining psychologist, with respect to which the ALJ found in relevant part:

> . . . While on June 12, 2007, evaluating (non-treating) psychologist Dan Neims, Psy-D, opined that the claimant would be "not significantly" or only "mildly" limited in performing simple repetitive tasks, but "moderately" and even "markedly" limited in other areas of mental and cognitive functioning, I note that the claimant was proclaimed "stable" on discharge from ongoing psychological therapy way back on February 21, 2006 (Ex. 10-F, p. 3), and then from her substance recovery program on September 21, 2006 (Ex. 17-F), without any evidence of additional psychological or psychiatric therapy since then.  Therefore, I accord less weight to the one-time medical opinions of non-treating psychologist Dr. Neims because they are not supported, even contradicted, by ongoing medical signs and laboratory findings of a longitudinal nature, not even new treatment or counseling/therapy notes from him, so their opinions must be considered "non-durational."

Tr. 19.  Specifically, plaintiff asserts that because there is no other consultative medical opinion source evidence in the record to refute the opinions of Dr. Neims, it was improper for the ALJ to reject them for the reasons that he did.

Consultative opinion source evidence, however, is not the only type of objective medical evidence upon which an ALJ may rely to reject evidence from another such source.   A mental or physical impairment, for example, "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R.§404.1508,§416.908.  It thus must be established by medical evidence "consisting of signs, symptoms, and laboratory findings," which clearly encompass more than just consultative medical opinions, including findings obtained from mental status examinations, such as those contained in the mental health counseling treatment notes discussed above. See Clester v. Apfel, 70 F.Supp.2d 985, 990 (S.D. Iowa 1999) (mental status examination results provide basis for psychiatric diagnosis, just as results of physical examination provide basis for diagnosis of physical illness or injury).

Also as discussed above, those mental health treatment notes show plaintiff showed very

ORDER - 10

mild symptoms and significant improvement in her condition since at least May 2005, and, as the ALJ pointed out, the record shows no evidence of further mental health treatment or problems on plaintiff's part since her discharge from therapy in late February 2006. Plaintiff asserts, though, that it is not her fault that defendant took two years to schedule an administrative hearing in this matter, and argues that where such a delay has occurred, it is incumbent upon the ALJ presiding over the hearing to ensure that the record is complete. This, the ALJ could have done, she states, by scheduling a consultative evaluation to challenge the opinions of Dr. Neims.

The Court, however, finds that given the record in this case, the ALJ had no duty to do so. An ALJ has the duty "to fully and fairly develop the record and to assure that the claimant's interests are considered." Tonapetyan, 242 F.3d 1144, 1150 (9th Cir. 2001) (citations omitted). But it is only where the record contains "[a]mbiguous evidence" or the ALJ finds "the record is inadequate to allow for proper evaluation of the evidence," that the ALJ's duty to "conduct an appropriate inquiry" is triggered. Id. (citations omitted); see also Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001) (duty to further develop record triggered only when there is ambiguous evidence or when record is inadequate to allow for proper evaluation of evidence). In this case, the record was sufficient for the ALJ to base his determination that the longitudinal nature of the objective medical evidence in the record called into question the functional limitations found by Dr. Neims. Plaintiff has not shown otherwise, nor has she demonstrated, as discussed above, that her condition changed such that adoption of those limitations was warranted.

II.     The ALJ Properly Assessed Plaintiff's Credibility

Questions of credibility are solely within the control of the ALJ. See Sample, 694 F.2d at 642. The Court should not "second-guess" this credibility determination. Allen, 749 F.2d at 580. In addition, the Court may not reverse a credibility determination where that determination is

ORDER - 11

based on contradictory or ambiguous evidence. See id. at 579.  That some of the reasons for discrediting a claimant's testimony should properly be discounted does not render the ALJ's credibility determination invalid, as long as it is supported by substantial evidence. Tonapetyan , 242 F.3d at 1148.

To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for the disbelief." Lester, 81 F.3d at 834 (citation omitted).  The ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints." Id.; see also Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993).  Unless affirmative evidence shows the claimant is malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing." Lester, 81 F.2d at 834.  The evidence as a whole must support a finding of malingering. See O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th Cir. 2003).

In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other testimony that "appears less than candid." Smolen, 80 F.3d at 1284.  The ALJ also may consider a claimant's work record and observations of physicians and other third parties regarding the nature, onset, duration, and frequency of symptoms. See id.

Plaintiff asserts the ALJ failed to give proper consideration to her subjective complaints and testimony, but points to no specific instances of such failure on the ALJ's part.  Indeed, the Court finds the ALJ did not err in determining her to be not fully credible.  For example, the ALJ discounted plaintiff's credibility in part for the following reason:

> . . . The claimant has alleged severe ADHD, a bi-polar disorder, PTSD, a borderline personality disorder causing memory and concentration problems, confusion, frustration, anger, and emotional outbursts, etc., yet as detailed above, she admits abusing methamphetamine until March 2005 and after which, the ongoing mental health treatment notes repeatedly inform that her condition was stabilized and even eventually in her own words "cured" by

ORDER - 12

> February 2006.  While the claimant may well have had a "history of suicidal thinking," the record from the time period relevant to her claim does not document any suicidal attempts or even chronic ideation.

Tr. 20.  This was proper, as a claimant's credibility may be discounted on the basis of medical improvement.  See Morgan v. Commissioner of Social Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999); Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998).

The ALJ also discounted plaintiff's credibility in part on the following basis:

> In a March 7, 2003 Daily Activities form, the claimant reported that she remained able to cook simple meals, do the dishes, sweep, mop, dust, vacuum, clean the bathroom, and do her own laundry.  The claimant further informed that her mental complaints and symptoms did not prevent her from being unable to pay bills; she maintained the concentration and self-control necessary to drive a motor vehicle, she could go out alone in public without accompaniment, and she attended ongoing group therapy with other individuals.  The claimant described her hobbies at that time to include star-gazing 2-3 nights a month and rock-hunting 1-2 days a month.  She also read and watched the news on television (Ex. 4-E).

> Circa December 1, 2004, the claimant, a single mother, was taking care of a 12 year-old daughter, including getting her up and ready for school, as well as caring for a 5 year-old cat.  The claimant reported that she still drove a car "sometimes" and was fully able to use public transportation, shop for groceries, pay bills, and handle bank accounts.  The claimant explained that she was assisted with some household chores by her 18 year-old daughter (Ex. 6-E).

> I note that there are no 3rd Party Daily Activities or Function Reports in the record, and with the exception of a humorous remark made by the claimant about calling CPS [Child Protective Services], there is no evidence that she was ever considered by Child Protective Services during the relevant period to be anything less than an appropriate primary caretaker for her 3 children, including one of whom should now be approaching his 2nd birthday.

Tr. 20.  To determine whether a claimant's symptom testimony is credible, the ALJ may consider his or her daily activities.  Smolen, 80 F.3d at 1284.  Such testimony may be rejected if the claimant "is able to spend a substantial part of his or her day performing household chores or other activities that are transferable to a work setting."  Id. at 1284 n.7.  The claimant need not be

ORDER - 13

"utterly incapacitated" to be eligible for disability benefits, however, and "many home activities may not be easily transferable to a work environment." Id.  Here, while not all of the activities cited by the ALJ show plaintiff is capable of spending a substantial part of her day performing household chores, a number of them do, including, as noted by the ALJ, taking proper care of a very young child.

III.     The Hypothetical Question the ALJ Posed to the Vocational Expert Was Proper

If a disability determination "cannot be made on the basis of medical factors alone at step three of the sequential disability evaluation process," the ALJ must identify the claimant's "functional limitations and restrictions" and assess his or her "remaining capacities for work-related activities." Social Security Ruling ("SSR") (SSR) 96-8p, 1996 WL 374184 *2.  A claimant's residual functional capacity ("RFC") assessment is used at step four of the evaluation process to determine whether he or she can do his or her past relevant work, and at step five to determine whether he or she can do other work. See id.  It thus is what the claimant "can still do despite his or her limitations." Id.

A claimant's residual functional capacity is the maximum amount of work the claimant is able to perform based on all of the relevant evidence in the record. See id.  However, an inability to work must result from the claimant's "physical or mental impairment(s)." Id.  Thus, the ALJ must consider only those limitations and restrictions "attributable to medically determinable impairments." Id.  In assessing a claimant's RFC, the ALJ also is required to discuss why the claimant's "symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other evidence." Id. at *7.

The ALJ in this case found in relevant part that "secondary to her depression," plaintiff "would be restricted to simple or 'unskilled' work requiring limited direct interaction with co-

ORDER - 14

workers and the general public." Tr. 22.  At the hearing, the ALJ posed a hypothetical question to the vocational expert, which contained substantially the same mental functional limitations as the ALJ included in his assessment of plaintiff's RFC. See Tr. 533-34.  In response to that hypothetical question, the vocational expert testified that an individual with those limitations, and who had the same age, education and work experience as plaintiff, would be able not only to perform her past relevant work, but other jobs as well. See Tr. 534-35.

Plaintiff has the burden at step four of the disability evaluation process to show that she is unable to return to her past relevant work. Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).  If a claimant cannot perform his or her past relevant work, at step five of the disability evaluation process the ALJ must show there are a significant number of jobs in the national economy the claimant is able to do. See Tackett, 180 F.3d at 1098-99; 20 C.F.R.§416.920(d), (e).  The ALJ can do this either through the testimony of a vocational expert or by reference to defendant's Medical-Vocational Guidelines. Tackett, 180 F.3d at 1100-1101; Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2000).

An ALJ's findings will be upheld if the weight of the medical evidence supports the hypothetical posed by the ALJ. See Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir. 1987); Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984).  The vocational expert's testimony therefore must be reliable in light of the medical evidence to qualify as substantial evidence. See Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988).  Accordingly, the ALJ's description of the claimant's disability "must be accurate, detailed, and supported by the medical record." Id. (citations omitted).  The ALJ, however, may omit from that description those limitations he or she finds do not exist. See Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).

Based on the vocational expert's testimony, the ALJ found at step four of the sequential

ORDER - 15

disability evaluation process that plaintiff was not precluded from performing her past relevant work, and, in the alternative at step five thereof,[5] that she was capable of performing other jobs existing in significant numbers in the national economy.  See Tr. 21-23.  Plaintiff argues the ALJ erred in so finding here, because the hypothetical question he posed to the vocational expert did not include all of the functional limitations found by Dr. Neims.  But, as discussed above, as the ALJ did not err in rejecting those limitations, he was not required to adopt them or to include any of them in the hypothetical question he posed.

## CONCLUSION

Based on the foregoing discussion, the Court finds the ALJ properly concluded plaintiff was not disabled, and therefore hereby affirms defendant's decision.

DATED this 6th day of January, 2011.

Karen L. Strombom
United States Magistrate Judge

---

[5] Defendant employs a five-step "sequential evaluation process" to determine whether a claimant is disabled. See 20 C.F.R. § 416.920.  If the claimant is found either disabled or not disabled at any particular step thereof, the disability determination is made at that step, and the sequential evaluation process ends. Id.

ORDER - 16